[Cite as *In re T.E.*, 2026-Ohio-2598.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

IN RE: T.E.                        :        APPEAL NO.    C-250698
                                            TRIAL NO.     F/25/0075-01 X
                                   :

                                   :        *JUDGMENT ENTRY*


This cause was heard upon the appeal, the record, and the briefs.

For the reasons set forth in the Opinion filed this date, the judgment of the trial court is affirmed.

Further, the court holds that there were reasonable grounds for this appeal, allows no penalty, and orders that costs be taxed under App.R. 24.

The court further orders that (1) a copy of this Judgment with a copy of the Opinion attached constitutes the mandate, and (2) the mandate be sent to the trial court for execution under App.R. 27.


**To the clerk:**

**Enter upon the journal of the court on 7/8/2026 per order of the court.**


**By:**_____
        **Administrative Judge**

[Cite as *In re T.E.*, 2026-Ohio-2598.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO


IN RE: T.E.

:        APPEAL NO.    C-250698
         TRIAL NO.     F/25/0075-01 X

:

:        *O P I N I O N*


Appeal From: Hamilton County Juvenile Court

Judgment Appealed From Is: Affirmed

Date of Judgment Entry on Appeal: July 8, 2026


*The Bonecutter Firm, LLC,* and *Brenda L. Bonecutter,* for Appellant Mother,

*R. Aaron Maus, Esq.,* for Appellee Father.

**BOCK, Judge.**

{¶1}   Appellant Mother appeals the juvenile court's judgment awarding appellee Father legal custody of their child, T.E. In eight assignments of error, Mother challenges the juvenile court's interim custody award, denial of her motion to remove the guardian ad litem ("GAL"), and award of legal custody to Father.

{¶2}   First, Mother's assignments of error involving the interim-custody order are moot and we do not consider them. Next, we hold that the juvenile court acted within its discretion when it denied Mother's motion to replace the GAL. Mother relies on evidence outside of the record and has not demonstrated an abuse of discretion. Finally, we hold that the juvenile court did not abuse its discretion by awarding Father legal custody of T.E. The juvenile court considered the relevant statutory best-interest factors, and its findings are supported by the record.

{¶3}   We overrule Mother's eight assignments of error and affirm the juvenile court's judgment.

## I.  *Factual and Procedural History*
### A.  *After Mother's and Father's relationship deteriorated, Father sought custody of T.E.*

{¶4}   Mother and Father welcomed T.E. in 2017 and the family lived together in Loveland, Ohio. When Mother and Father's relationship ended, Mother assumed the primary caregiver role. For years, Mother and Father managed their coparenting relationship and ensured that T.E. had parenting time with Father without court involvement.

{¶5}   But their peaceful coparenting ended in 2024 after Mother and Father's relationship soured and Mother restricted Father's parenting time. In 2025, Father filed a pro se petition for custody, shared parenting, or parenting time with then-seven-year-old T.E. Months later, the magistrate appointed a GAL for T.E. and set an

August 1, 2025 pretrial hearing and an October 2025 trial on Father's custody petition. At a June 2025 hearing, Father's counsel orally requested interim custody due to Mother's planned move to Georgetown, Kentucky, which would cause T.E.'s school placement for the 2025-2026 school year to change from Loveland City School District ("Loveland Schools") to a school near Mother's new home.

**{¶6}** Days before the scheduled pretrial hearing, the GAL filed her report and recommended granting Father legal custody of T.E. and ordering Mother parenting time. The GAL's report discussed T.E.'s autism diagnosis, his need for stability, and his adjustment to his community and school in Loveland; his positive relationships with Father and Paternal Grandfather; Mother's cohabitating with her paramour (H.W.) soon after they met; Mother's ending T.E.'s cello lessons despite evidence that T.E. loved, and benefited from, the cello; and Mother's restricting, and then ending, T.E.'s time with Father and Paternal Grandfather. The GAL believed H.W. heavily influenced Mother's decisions and that T.E. struggled as a result.

**{¶7}** The magistrate declined to address Father's oral motion for interim custody at the August 1 hearing.

### B. Interim custody

1. *The juvenile court awarded Father interim custody of T.E. without an evidentiary hearing*

**{¶8}** Immediately after the August 1 hearing, Father filed a written motion for interim custody. The magistrate scheduled an evidentiary hearing to address the motion on August 26, 2025, and ordered bi-weekly parenting time for Father from Friday night to Sunday night. But on August 7, 2025, the "matter [wa]s . . . transferred to the Judicial docket for all further hearings" and the juvenile court scheduled an in-person counsel-only pretrial hearing on August 14, 2025, at 9:00 a.m. The night before

the hearing, however, after the close of business, Mother moved to continue the interim custody hearing, citing her counsel's unavailability. The juvenile court denied Mother's request for a continuance because her counsel had failed to respond to emails from court staff and to propose alternative dates and times for the hearing.

{¶9} After a non-evidentiary hearing with the GAL and Father's counsel, based on Father's motion and accompanying affidavit, the juvenile court awarded Father interim custody of T.E.

### 2. *The juvenile court granted Mother's new-trial motion*

{¶10} The next day, Mother filed motions for a new trial under Civ.R. 59, for relief from judgment under Civ.R. 60, and for a stay of the proceedings under Civ.R. 62(A). Weeks later, she moved for a new GAL because the GAL "argued alongside presumably counsel for Father" and "argue[d] with counsel on scheduling matters."

{¶11} At the hearing on Mother's motions, Mother argued that the interim-custody matter was "improperly heard" because the court's scheduling orders failed to give her notice of the hearing and because Father's motion was insufficient to warrant an emergency order. The juvenile court informed Mother that its interim-custody order was based on "the writing that had been submitted by the parties," and while Father and the GAL "placed things on the record," there was no "sworn testimony in any way." The juvenile court did "not believe that there was an error in the proceedings or that the parties were subject to prejudice." It explained upon a party's written request and affidavit seeking temporary custody, R.C. 3109.043 authorized it to issue, without an oral hearing, temporary orders allocating parenting rights and responsibilities during the pendency of a custody action. Nevertheless, it granted Mother's new-trial motion and heard testimony that day regarding the interim orders.

### 3. *Evidentiary hearing on Father's motion for interim custody*

**{¶12}** Mother and Father testified at the hearing on Father's interim-custody motion. The GAL questioned both parties but offered no witnesses or testimony.

**{¶13}** In May 2025, Mother and T.E. moved into H.W.'s house in Georgetown, Kentucky. In the fall, T.E. attended third grade at his new Kentucky school for three days before the juvenile court's original interim custody order returned T.E. to Loveland with Father. T.E. returned to Loveland Schools. Mother gave conflicting testimony about the transfer of T.E.'s Individualized Education Plan[1] ("I.E.P.") from Loveland Schools to his Kentucky school. Mother thought T.E. had missed school or been tardy since being in Father's care. She also believed the Loveland Schools isolated T.E. due to his autism diagnosis, that T.E. was behind his peers, and that his move to a new building with new teachers denied T.E. consistency. Further, Mother explained that Father had denied or limited Mother's unsupervised parenting time and had kept Mother in the dark about T.E.'s school, insurance, and medical care.

**{¶14}** Father testified that T.E. was doing well in the Loveland Schools. Father admitted he instructed Paternal Grandfather to supervise Mother's parenting time out of fear that Mother would take T.E. back to Kentucky and never return. Apparently, Mother and H.W. had tried to retrieve T.E. from Paternal Grandfather's house one day and from school the next day. Father had enrolled T.E. in therapy, but he failed to inform Mother.

**{¶15}** The juvenile court denied Mother's motions for relief from judgment, a stay of the proceeding, and a new GAL. It reinstated Father's interim custody award under R.C 3109.043 and Juv.R. 13(A), ordered that T.E. attend school in Loveland,

---

[1] *See* 20 U.S.C. 1401(14) and 20 U.S.C. 1414(d).

and awarded Mother parenting time. The juvenile court encouraged the parties to work cooperatively over parenting-time issues, explaining that "grandpa seems great, mom seems great, dad seems great," and that "everybody is on equal footing."

### C. Hearing on Father's custody motion

{¶16}   The juvenile court held hearings in September and October 2025. The evidence involved T.E.'s education, relationships with Mother, H.W., Father, and Paternal Grandfather, and cello lessons. The juvenile court interviewed T.E. in camera.

#### 1. *T.E.'s life in Loveland, Ohio until 2024*

{¶17}   T.E. lived in and around Loveland, Ohio until May 2025. After Mother and Father split up in 2021, T.E. lived with Mother and spent weekends with Father. Mother and Father co-parented amicably until late 2024. Both Mother and Father worked, so Paternal Grandfather watched T.E. after school. Maternal Grandmother and Maternal Aunt also provided childcare for T.E.

{¶18}   When T.E. was three years old, Paternal Grandfather signed him up for cello lessons. T.E.'s cello instructor testified that through his lessons, T.E. improved his fine-motor skills and his ability to follow directions, read rhythm, and reproduce music. By late 2024, T.E. could play a 30-minute-long recital from memory, an accomplishment that the instructor attributed to discipline, practice, and dedication. T.E.'s first-and-second-grade intervention specialist arranged for T.E. to perform his cello for his first-grade classmates, an experience that she described as "really positive." The intervention specialist recalled T.E.'s classmates applauding T.E., who was "smiling from ear to ear."

{¶19}   Father worked night shifts and lived in Paternal Aunt's house with Paternal Aunt and her hypoallergenic dog. Paternal Aunt watched T.E. while Father worked. One night in December 2023 while Father was at work, T.E. awoke and

wandered outside to look for Father. The police found T.E. outside at night in his pajamas, notified Mother, and eventually returned T.E. to Paternal Aunt's house. Father testified that this was an isolated incident and he subsequently installed deadbolt locks and alarms to prevent T.E. from wandering outside again. Mother did not restrict Father's time with T.E. after this incident.

### 2. *Changes to T.E.'s life in 2024*

{¶20} T.E. experienced several changes in 2024. In May 2024, Mother met H.W. In late June 2024, Mother brought T.E. to a short-term rental near Loveland to meet H.W. in person for the first time. About two weeks later, Mother and T.E. moved into an apartment near Loveland with H.W.

{¶21} H.W. testified and described his influence on Mother and her ability to parent T.E. as positive. H.W. explained that he is "well versed with being able to teach stuff" because he tutored his peers in high school and has autistic relatives. Yet, H.W. has no formal autism or education training.

{¶22} According to H.W., T.E.'s "ability to function" had improved, in part, because of H.W. In H.W.'s view, a person meeting T.E. for the first time "wouldn't even know that [T.E.] was autistic." H.W. also saw improvements in T.E.'s emotional regulation. H.W. viewed himself as T.E.'s disciplinarian and believed in strict, consistent discipline. While H.W. characterized T.E. as poorly behaved previously, T.E. was "extremely well behaved and well mannered" because of H.W.'s influence.

{¶23} T.E. attended Loveland Primary School for first and second grade. T.E.'s second-grade teacher and his intervention specialist have a combined 49 years of teaching experience. Both testified that T.E. is a "great kid," a hard worker, "high functioning," and a good communicator. T.E. receives support for his autism under his I.E.P. But T.E. was in a general-education classroom, did not require a modified

8

curriculum, and was "on grade level." According to the two educators, T.E. enjoyed positive relationships with his peers and classmates. His second-grade teacher testified that T.E., like other children with autism, thrives with "schedules and routines." Disruptions to T.E.'s routine would cause "anxiety" and "excitement."

**{¶24}** At the start of the 2024-2025 school year, Parental Grandfather watched T.E. after school. They played, practiced cello, and spent quality time together. But when Mother lost her job that fall, she began caring for T.E. after school. H.W. and Mother imposed a stricter schedule with a greater emphasis "on school work." H.W. found it "unacceptable" that Father did not demand better handwriting from T.E., so H.W. often erased T.E.'s work that he found unsatisfactory.

**{¶25}** After a tense phone call between Mother and Father in the fall of 2024, Mother reduced Father's parenting time from weekends to Saturdays only. In late October, H.W. and Mother prohibited T.E. from visiting Father to celebrate Halloween as a punishment for "not listening."

**{¶26}** Around that time, Mother ended T.E.'s cello lessons. T.E.'s cello instructor testified that T.E. had been "pulled out of cello lessons . . . against his will." Paternal Grandfather tried to contact Mother, but she ignored his attempts. Mother told the GAL that she ended cello lessons because T.E. was no longer interested in the instrument. But at the hearing, Mother testified that she ended lessons because T.E. was no longer going to Paternal Grandfather's house after school. She explained that T.E.'s interest in music was not limited to cello and she was receptive to T.E. resuming cello lessons in Kentucky or learning a different instrument altogether. Yet, T.E. asked to take drum lessons and Mother made no attempt to find him lessons. H.W. testified that T.E. started having bedwetting issues around this time.

{¶27} T.E.'s second-grade teacher and intervention specialist both saw behavioral changes at school around this time. T.E.'s teachers saw an increase in "anxiety and stress about his change in where he was going after school." T.E.'s second-grade teacher recalled him "crying in the hallway waiting when he was lined up." In the classroom, T.E. needed greater sensory input and started disrupting the classroom by "making these loud [] repetitive [] words or phrases," like "'mistake' in [] sort of a robot voice." His intervention specialist testified that T.E. "couldn't stop" and "couldn't help himself." His second-grade teacher described T.E. as "emotionally down," agitated, "crying a little bit more often," and impolite at times. Both educators reached out to Mother and Father, who were generally responsive to teacher communications. Mother "didn't know of any changes at the time" and wondered if it was "a school problem."

### 3. *Mother ended Father's parenting time and moved to Kentucky in 2025*

{¶28} In early 2025, around the time that Father petitioned for custody, Father and Paternal Grandfather started visiting T.E. at school during lunchtime. T.E. had commented to his teacher that he "miss[ed] his grandpa and his dad," so the school helped facilitate the visits to help to "relieve that anxiety for him." T.E.'s second-grade teacher recalled T.E. being "excited" and "run[ing] down the hall and jump[ing] into their arms and hav[ing] fun with them at lunch." The intervention specialist testified that, while T.E.'s behavior at school had improved, the visits "didn't solve [] everything" and T.E. still exhibited "more anxiety-driven behavior." The principal of Loveland Primary School testified that Mother contacted him to end Father's and Paternal Grandfather's lunchtime visits. At Mother's request, the principal observed a few visits but saw nothing of concern.

**{¶29}** At a February 2025 I.E.P. meeting, T.E.'s second-grade teacher and intervention specialist met H.W. for the first time. There, they learned about the changes to T.E.'s life. In the meeting, H.W. "was kind of speaking for [Mother], and he would say things and she would just agree." H.W. expressed "concerns about things that [T.E.'s teachers] weren't even concerned about."

**{¶30}** Weeks later, Father took T.E. to a wake for a family member and returned him to Mother later than usual, sometime around 8:30 p.m. Mother threatened to call the police. Shortly after that incident, Mother ended Father's parenting time altogether. Mother testified that she ended Father's parenting time because Father was often "late" to exchanges and Mother "did not know when or what was going on." She claimed to be amenable to restarting Father's parenting time if he asked. Yet, she agreed that there were times that she had denied Father's requests for extended parenting time in the past. She also denied Paternal Grandfather's attempts to see T.E. And when Paternal Grandfather's partner of four years tried to talk to Mother about visits, Mother directed her to speak to Mother's attorney.

**{¶31}** Around this time, Mother told H.W. that T.E. had attempted to masturbate. While Mother's family assured her it was "normal," H.W. warned her that this behavior was consistent with child sexual abuse. So, Mother began suspecting Father's family members of sexually abusing T.E. Following an April 2025 interview of T.E., the Mayerson Center deemed the allegations "inconclusive."

**{¶32}** In May 2025, on his last day of second grade, Mother moved T.E. to live with H.W. in Georgetown, Kentucky. Mother enrolled T.E. in Southern Elementary School before the juvenile court awarded Father interim custody. T.E. attended school in Georgetown for just three days and, according to Mother, "was very happy" there.

#### 4. *T.E. returned to Loveland and cello lessons*

**{¶33}** After the juvenile court awarded Father interim custody, Father completed school paperwork and returned T.E. to Loveland Schools. While T.E. attended third grade in a new building, Loveland Schools had procedures in place to help students like T.E. successfully transition from one building to the next. T.E.'s intervention specialist and principal testified that T.E. appeared to be "happy" in third grade at Loveland Elementary School.

**{¶34}** Father and Paternal Grandfather testified that T.E. seemed comfortable in his old routine. T.E. returned to cello lessons and his instructor described him as "very excited." Paternal Grandfather and Paternal Aunt provide childcare for T.E. when Father worked nights. T.E. spent time after school with Paternal Grandfather, and Paternal Grandfather's partner testified that T.E. was in "a good mood, happy, [and] the old [T.E.]" after returning to his old schedule.

**{¶35}** Father wants T.E. to remain in the Loveland Schools, citing its rank among Ohio schools. Father also wished for T.E. to have a relationship with his Mother, though he agreed that he "communicated nothing" to her about T.E.'s school, therapy, and health when he first got custody. Paternal Grandfather testified that Father has a great relationship with T.E.

**{¶36}** According to Mother, T.E. was "doing horrible" at Loveland Schools and lacked the necessary school supplies. Mother also testified that Father failed to communicate with her about T.E.'s allergies, healthcare, health insurance, and an October 2025 I.E.P. meeting. H.W., Maternal Aunt, and Maternal Grandmother described Mother as a loving and dedicated parent.

### D. *The juvenile court awarded Father legal custody of T.E.*

**{¶37}** The juvenile court made numerous best-interest findings under R.C. 3109.04(F)(1). Because it concluded that awarding legal custody of T.E. to Father was in T.E.'s best interest, the juvenile court granted Father's motion, awarded him custody of T.E., and granted Mother parenting time.

## II. *Analysis*

**{¶38}** In eight assignments of error, Mother raises issues with the juvenile court's awards of interim custody and legal custody to Father, and denial of her motion for a new GAL. For ease of analysis, we address her assignments of error out of order.

**{¶39}** But we begin by noting that several of Mother's assignments of error lack a standard of review as required by Loc.R. 16.1(A)(4)(c) and lack citations to the relevant legal authority as required by App.R. 16(A)(7). And citations to the record, which are required by App.R. 16(A)(6), are missing in both Mother's and Father's statements of fact.

**{¶40}** To carry their burden on appeal, appellants must demonstrate that "the relevant case law, applied to the facts of this case, justifies a decision in [their] favor." *Util. Serv. Partners v. PUC*, 2009-Ohio-6764, ¶ 53. These rules are not mere suggestions, and "[f]ailing to marshal an 'authority-based argument' often carries dire consequences." *Twang, LLC v. City of Cincinnati*, 2024-Ohio-6077, ¶ 36 (1st Dist.), quoting *Ohiotelnet.com, Inc. v. Windstream Ohio, Inc.*, 2013-Ohio-4721, ¶ 17. Indeed, "[i]t is not the job of this court to develop or root through the record and relevant authorities to find support for a party's position." *Guthrie v. Guthrie*, 2024-Ohio-5581, ¶ 12 (1st Dist.).

**{¶41}** Citations to the record are particularly critical for fact-intensive assignments of errors like Mother's. *See id.* at ¶ 13 ("Jill is advancing several record-

intensive arguments in this appeal, and the lone record citation fails to provide us with an adequate guide as to where in the record any potential error occurred."). And parties must support their arguments with citations to the law because "'facts dumped into a brief do not make a legal argument.'" *Edje v. Holmes*, 2024-Ohio-1663, ¶ 65 (1st Dist.), quoting *SYNY Logistics, Inc. v. Great Lakes Ins. SE*, 696 F.Supp.3d 504, 513 (N.D.Ill. 2023). A brief consisting of "impenetrable arguments and unsupported assertions . . . organized in ways that escape our understanding" ultimately frustrates appellate review. *McCurry v. Kenco Logistics Servs., LLC*, 942 F.3d 783, 791 (7th Cir. 2019). We have warned parties that, "[t]he failure to cite to the record, to cite and discuss the relevant authority, and to cite the standard of review . . . serves as an independent basis for us to overrule [an] assignment[] of error." *Guthrie* at ¶ 12.

**{¶42}** While Mother's brief is disjointed and difficult to follow, the law and parties are better served when a case is decided on the merits. *See Twang* at ¶ 36. With that in mind, we turn to Mother's assignments of error.

### A. Mother's interim-custody arguments are moot

**{¶43}** In her first, second, and third assignments of error, Mother argues that the juvenile court erred when it granted Father interim custody of T.E. following an ex parte hearing and then denied her request for relief from judgment. In her sixth assignment of error, she argues that the juvenile court erred when it placed Paternal Grandfather on equal footing with Mother in a remark at the hearing on her motions. In her seventh assignment of error, she appears to argue that the juvenile court erred as a matter of law because she was allegedly unable to defend against Father's interim-custody motion. And in her eighth assignment of error, Mother claims that the juvenile court abused its discretion and reraises issues surrounding the interim-custody order.

**{¶44}** The juvenile court may issue "temporary orders concerning the custody or care of a child who is subject of a complaint as the child's interest and welfare may require." Juv.R. 13(A). An order entered under Juv.R. 13 is "temporary and within the juvenile court's subject-matter jurisdiction under R.C. 2151.23(A)(2)." *In re J.L.*, 2026-Ohio-1216, ¶ 19 (1st Dist.), citing *Rowell v. Smith*, 2012-Ohio-4313, ¶ 19, 22.

**{¶45}** But because interim-custody orders "last[] only during the pendency of the underlying complaint," a final custody order supersedes the juvenile court's interim-custody order entered under Juv.R. 13. *Id.* at ¶ 22. When "the juvenile court has entered a final custody determination, any issue challenging the—now superseded—temporary order is moot." *Id.*, citing *C.T.F. v. A.B.M.*, 2024-Ohio-1998, ¶ 33-36 (10th Dist.); *see Ryan v. Ryan*, 2007-Ohio-6568, ¶ 11 (5th Dist.); *see also In re J.L.R.*, 2009-Ohio-5812, ¶ 29 (4th Dist.); *Long v. Long*, 2010-Ohio-4817, ¶ 16 (3d Dist.); *Barry v. Rolfe*, 2008-Ohio-3131, ¶ 39 (8th Dist.). And "when an issue raised on appeal is moot, we need not address its merits because a justiciable controversy no longer exists." *C.T.F.* at ¶ 35.

**{¶46}** The juvenile court entered a final custody order, which supersedes the interim-custody orders and renders any challenges to the interim-custody hearing and orders moot. We dismiss Mother's first, second, and third assignments of error and decline to address any issues raised in her sixth, seventh, and eighth assignments of error involving the interim-custody hearing and order because they are moot.

### B. *We affirm the denial of Mother's motion to replace the GAL*

**{¶47}** In her fourth assignment of error, Mother challenges the juvenile court's decision to deny her motion for a new GAL. Mother does not identify a standard of review, but we review juvenile courts' decisions regarding GAL appointments for an abuse of discretion. *See In re S.M.K.*, 2008-Ohio-6733, ¶ 44 (2d Dist.). A juvenile court

abuses its discretion when it "exercise[es] its judgment, in an unwarranted way, in regard to a matter over which it has discretionary authority." *Johnson v. Abdullah*, 2021-Ohio-3304, ¶ 35.

**{¶48}** Mother contends that the GAL "was argumentative with counsel, inappropriate with counsel in scheduling matters" and failed to fulfill her duties under Sup.R. 8.03(A)(2). Under Sup.R. 8.03(A)(2), the GAL must maintain "independence, objectivity, and fairness, as well as the appearance of fairness, in dealings with parties and professionals, both in and out of the courtroom."

**{¶49}** On appeal, Mother cites "the argument presented at the counsel only pretrial" hearing as proof of the GAL's misconduct. And at the hearing on Mother's motion to replace the GAL, Mother cited the GAL's misconduct during "some of the Zoom pretrials and everything else, including communication with [the juvenile court] and [the juvenile court's] assistant, and saying, you know, here's what was said and here's what we're doing and screenshotting things back to me and arguing."

**{¶50}** Mother failed to file a transcript of the ex parte hearing. Nor did she attempt to supplement the record with a statement under App.R. 9(C), which allows an appellant to "prepare a statement of the evidence or proceedings from the best available means" when no transcript is available.

**{¶51}** As we have explained, when the resolution of an assignment of error depends on "facts shown in a transcript of proceedings, the duty to provide that transcript necessarily falls upon the appellant." *State v. Bumu*, 2017-Ohio-6901, ¶ 14 (1st Dist.). Indeed, App.R. 9(B) requires an appellant to "order a transcript of any 'proceedings [she] considers necessary for inclusion in the record'" and ensure that the transcripts are both properly transcribed and filed with the clerk. *Id.* at ¶ 15, quoting App.R. 9(B)(1). Without a transcript, we "must presume the regularity of the

lower court's proceedings and affirm the judgment of the court below." *Id.* at ¶ 16, citing *Knapp v. Edwards Laboratories*, 61 Ohio St.2d 197, 199 (1980).

{¶52} We therefore must presume the regularity of the ex parte proceeding. Mother has not carried her burden to prove the juvenile court abused its discretion by denying her motion to replace the GAL. We overrule the fourth assignment of error.

## C. *We affirm the juvenile court's award of legal custody to Father*

{¶53} In her fifth assignment of error, Mother argues that the juvenile court's decision to grant legal custody of T.E. to Father was contrary to the manifest weight of the evidence. Mother's sixth assignment of error appears to argue that the juvenile court erred by failing to consider that, in her view, Father abdicated his parental responsibilities and foisted them on Paternal Grandfather. Mother's seventh assignment of error claims that the juvenile court erred as a matter of law because "this is not a school case where there is a hearing on who has a better school district." Similarly, her eighth assignment of error asserts that several of the juvenile court's findings amounted to an abuse of its discretion.

### 1. *Legal-custody decisions on appeal*

{¶54} Mother fails to identify the legal test for legal-custody decisions and fails to cite statutes or case law in support of her arguments. That said, Ohio courts have long recognized that "[c]hild-custody decisions 'are some of the most difficult and agonizing decisions a trial judge must make.'" *Ijakoli v. Alungbe*, 2024-Ohio-5287, ¶ 46 (1st Dist.), quoting *Davis v. Flickinger*, 1997-Ohio-260, ¶ 12. As a result, we review the juvenile "court's decision on legal custody of a child under an abuse-of-discretion standard." *In re J.L.*, 2026-Ohio-1216, at ¶ 29 (1st Dist.). Reversal is proper "if competent, credible evidence does not support the juvenile court's decision regarding [the child]'s best interest." *In re J.M.*, 2022-Ohio-2400, ¶ 10 (1st Dist.).

17

**{¶55}** The juvenile court is better positioned to assess a child's best interests, so we afford considerable deference to the juvenile court's credibility determinations and weighing of the evidence. *Id.*, quoting *Davis* at ¶ 22, quoting *Pater v. Pater*, 63 Ohio St.3d 393, 403 (1992) (Resnick, J., concurring in part and dissenting in part). So, we "'accept the trial court's findings of fact if they are supported by [] competent, credible evidence.'" *In re E.H.,* 2023-Ohio-470, ¶ 25 (1st Dist.), quoting *State v. Ruberg*, 2013-Ohio-4144, ¶ 10 (1st Dist.).

**{¶56}** Under R.C. 3109.04(B)(1), a court allocating custodial rights "in an original proceeding . . . shall take into account that which would be in the best interest of the children." The best interest of a child "'"is a fluid concept, as it involves the child's continually-changing need for appropriate care."'" *In re D.V.*, 2022-Ohio-1024, ¶ 12 (1st Dist.), quoting *In re D.M.*, 2020-Ohio-3273, ¶ 47 (1st Dist.), quoting *In re G.L.S.*, 2018-Ohio-1606, ¶ 16 (9th Dist.).

**{¶57}** When determining a child's best interest, the juvenile court must consider all relevant best-interest factors, including the non-exhaustive list of statutory factors under R.C. 3109.04(F)(1). Of course, the juvenile court "'has discretion in determining which factors are relevant'" and "each factor may not necessarily carry the same weight or have the same relevance, depending upon the facts before the trial court." *Brammer v. Brammer*, 2013-Ohio-2843, ¶ 41 (3d Dist.), quoting *Hammond v. Harm,* 2008-Ohio-2310, ¶ 51 (9th Dist.); *see Davidson v. Hodge*, 2023-Ohio-1638, ¶ 25 (1st Dist.).

**{¶58}** The juvenile court found the following best-interest factors relevant to Father's complaint and made detailed findings for each of those factors:

(a) The wishes of the child's parents regarding the child's care;

(b) If the court has interviewed the child in chambers . . . the wishes and concerns of the child, as expressed to the court;

(c) The child's interaction and interrelationship with the child's parents, siblings, and any other person who may significantly affect the child's best interest;

(d) The child's adjustment to the child's home, school, and community;

. . .

(f) The parent more likely to honor and facilitate court-approved parenting time rights or visitation and companionship rights;

. . .

(j) Whether either parent has established a residence, or is planning to establish a residence, outside this state.

R.C. 3109.04(F)(1).

{¶59} Mother argues that the juvenile court's decision was against the weight of the evidence and an abuse of discretion. Though her arguments are somewhat unclear, it appears Mother takes issue with the juvenile court's findings under R.C. 3109.04(F)(1)(c), (d), (f), and (i). We address each finding accordingly.

2. *T.E.'s interactions and interrelationships with his parents and others*

{¶60} R.C. 3109.04(F)(1)(c) directs a court to consider "[t]he child's interaction and interrelationship with the child's parents, siblings, and any other person who may significantly affect the child's best interest."

{¶61} The juvenile court found that T.E. had positive relationships with Mother, Father, Paternal Grandfather, Paternal Grandfather's partner, Maternal Aunt, and Maternal Grandmother. But the juvenile court was "greatly concerned by [H.W.'s] role in [T.E.]'s life and his relationship with the child." It pointed out that

H.W. overestimated his expertise in parenting a child with autism despite his having no children and no qualifications or training outside of extracurricular tutoring in high school. The juvenile court had significant concerns about H.W.'s role in disciplining T.E., noting that his disciplinary measures were overly restrictive and reflected H.W.'s demand that T.E. live up to H.W.'s personal standards.

**{¶62}** Mother argues that the juvenile court misconstrued H.W.'s testimony when it found that he "pontificated that he is qualified to work with children with Autism." But H.W. testified he was qualified to help T.E. with schoolwork because he had tutored classmates in high school and "actually dealt with autistic kids that were falling behind in math. So I'm very well versed with being able to teach stuff like that." Later, he agreed that he educated Mother about T.E.'s behaviors citing his experience with his nieces and nephews, who have autism. While H.W. agreed he lacks formal training and insisted he was supporting Mother's parenting, we defer to the juvenile court's findings as it is better positioned to assess witness credibility and resolve evidentiary conflicts. *See In re A.C.*, 2019-Ohio-2891, ¶ 29 (1st Dist.).

**{¶63}** Mother also contends that the juvenile court "erred in treating [Paternal] Grandfather like a party and giving him more rights than Mother" because Paternal Grandfather testified about his involvement in T.E.'s life. But T.E.'s relationship and interactions with Paternal Grandfather, someone who "significantly affect[s] [T.E.]'s best interest," is relevant to the juvenile court's custody determination under R.C. 3109.04(F)(1).

**{¶64}** Next, Mother maintains that the juvenile court failed to mention "how strong or important the child's bond is with Mother, who was the sole custodial parent for almost 8 years." Ohio courts recognize that "the role of the child's primary caretaker is a factor warranting consideration in evaluating the child's interactions and

interrelationships with parents, as well as the child's adjustment to the child's home, school, and community." *Thompson v. Thompson*, 2011-Ohio-158, ¶ 14 (12th Dist.). But that is only one consideration relevant to a child's best interest and "does not create a presumption that the parent found to be the child's primary caretaker should be named the child's residential parent and legal custodian." *Id.* Critically, the juvenile court determined that Mother had a "positive relationship" and was bonded with T.E. The juvenile court discussed Mother's role in T.E.'s life before turning its attention to Mother's more recent parenting decisions that it found to be concerning. The juvenile court's findings are supported by the evidence in the record.

### 3. *T.E.'s adjustment to his home, school, and community*

**{¶65}** Under R.C. 3109.04(F)(1)(d), the juvenile court must consider "[t]he child's adjustment to the child's home, school, and community." The juvenile court found that T.E. was adjusted to his school, Father's home, and his community. While it recognized that T.E.'s routine fluctuated due to Father's working overnight shifts and the resulting sleep schedule, it had "concerns that Mother's relocation to Kentucky would be more disruptive to the child's routine." And "Mother's move to Kentucky inevitably led to less direct contact between the child and Father, Paternal Grandfather, Maternal Aunt, Maternal Grandmother, his school, and the cello."

**{¶66}** Mother argues in her seventh assignment of error that the "fact that Mother, as sole custodian for seven and half [sic] years moved to Kentucky and the child would no longer go to Loveland schools, is not a reason under law to change custody." This is simply incorrect. The Ohio legislature has identified a child's adjustment to school and home as a factor bearing on a child's best interest. *See* R.C. 3109.04(F)(1)(d). As the juvenile court recognized, the evidence clearly demonstrated

that T.E. "thrives on structure, routine, and consistency." So, T.E.'s school placement is relevant to T.E.'s best interest.

### 4. *The parent more likely to honor and facilitate parenting time*

**{¶67}** Finally, R.C. 3109.04(F)(1)(f) instructs the juvenile court to consider which parent is more likely to facilitate parenting-time rights or companionship rights. In its order, the juvenile court questioned both Mother's and Father's "ability and willingness to honor the other's parenting time." It cited Mother's decisions to reduce, then eliminate, Father's parenting time in late 2024 and early 2025. It also pointed to Father's unilateral decision to minimize Mother's parenting time after he received temporary custody of T.E. in August 2025.

**{¶68}** According to Mother, the evidence demonstrated that she is more likely to facilitate and honor Father's parenting-time rights. She explains that she involved Father in T.E.'s education decisions and testified that she would have allowed Father extra parenting time. But Mother also testified that she decided, with H.W.'s input, to reduce Father's parenting time with T.E. after Mother and Father argued. And despite T.E. exhibiting signs of distress that coincided with that reduction, Mother wholly eliminated Father's parenting time and interfered with Paternal Grandfather's companionship time with T.E. When she learned that Father and Paternal Grandfather visited T.E. at school during lunch, Mother contacted the school principal in an effort "to not have grandfather and father at lunch." This evidence supports the juvenile court's finding that Mother, like Father, did not demonstrate a willingness to honor the other parent's parenting time.

**{¶69}** In sum, the juvenile court considered the relevant factors bearing on T.E.'s best interests under R.C. 3109.04(F)(1), and its findings are supported by competent and credible evidence. Therefore, the juvenile court did not abuse its

discretion when it awarded Father legal custody of T.E. We overrule Mother's fifth, sixth, seventh, and eighth assignments of error.

### III. *Conclusion*

**{¶70}** We overrule the eight assignments of error and affirm the juvenile court's judgment.

Judgment affirmed.

**KINSLEY, P.J.,** and **NESTOR, J.,** concur.